IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 25-5025

❖❖

HAMPTON DELLINGER, IN HIS PERSONAL CAPACITY AND HIS OFFICIAL
CAPACITY AS SPECIAL COUNSEL OF THE OFFICE OF SPECIAL COUNSEL,

*Plaintiff-Appellee,*

—v.—

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## APPELLEE'S OPPOSITION TO APPELLANTS'
## EMERGENCY MOTION FOR A STAY PENDING APPEAL

JOSHUA MATZ
   *Counsel of Record*
JACKSON ERPENBACH
BENJAMIN STERN
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001 (202)
742-2661
jmatz@heckerfink.com

KATE DONIGER
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor New
York, New York 10118 (212)
763-0883

*Counsel for Plaintiff-Appellee
Hampton Dellinger*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

Plaintiff-Appellee is Hampton Dellinger, in his personal capacity and in his official capacity as Special Counsel of the Office of Special Counsel. Defendants-Appellants are Scott Bessent, in his official capacity as Secretary of the Treasury; Sergio Gor, in his official capacity as Director of the White House Presidential Personnel Office; Karen Gorman in her official capacity as Principal Deputy Special Counsel and, upon the purported removal of the Special Counsel, the Acting Special Counsel of the Office of Special Counsel; Karl Kammann, in his official capacity as the Chief Operating Officer of the Office of Special Counsel; Donald J. Trump, in his official capacity as President of the United States of America; and Russell Vought, in his official capacity as Director of the Office of Management and Budget.

No amici curiae or intervenors participated before the district court.

## B. Rulings under Review

The ruling under review is an administrative stay issued by the district court, the Honorable Amy Berman Jackson presiding, contained in a minute order entered on February 10, 2025, at 8:20 PM.

## C. Related Cases

This case has not been before this Court or any court other than the district court, and counsel for Plaintiff-Appellee is not aware of any related cases.

Dated: February 12, 2025

/s/ Joshua A. Matz

Joshua A. Matz
*Counsel for Plaintiff-Appellee*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT .......................................................................................................1

    I.     The United States Office of Special Counsel .............................................3

         A. The Founding and Mission of the OSC .................................................3

         B. The OSC's Jurisdiction and Functions ..................................................6

    II.    Procedural History ....................................................................................8

ARGUMENT .....................................................................................................10

    I.     The Court Should Deny a Stay Pending Appeal Because It Lacks Jurisdiction Over this Appeal .................................................................10

         A. The Court Lacks Appellate Jurisdiction .............................................10

         B. An Exercise of Mandamus Jurisdiction is Unwarranted .....................13

    II.    Defendants Fail to Establish Their Entitlement to Extraordinary Relief .14

         A. Defendants Are Not Substantially Likely to Prevail on the Merits ....14

         B. Defendants Fail to Establish Irreparable Harm Absent Relief ............20

         C. The Remaining Equitable Factors Cut Against Defendants ...............20

CONCLUSION ..................................................................................................24

CERTIFICATE OF COMPLIANCE ..................................................................25

CERTIFICATE OF SERVICE ..........................................................................26

**INTRODUCTION**

Defendants have manufactured an appellate emergency where none exists: they seek relief from a three-day "administrative stay" entered on Monday that will automatically expire tomorrow and that was entered solely to preserve the *status quo ante* for a few days while Defendants briefed and the district court considered a TRO application. The Court should deny Defendants' motion because there is no basis to exercise appellate jurisdiction here and because Defendants' arguments lack merit.

This past Friday night, President Donald J. Trump purported to terminate Special Counsel Hampton Dellinger from his Senate-confirmed role at the Office of Special Counsel (OSC). This occurred in violation of a statute conferring for-cause removal protections designed to ensure the independence of the OSC—a unique office that exists to shield whistleblowers from reprisal. Special Counsel Dellinger therefore filed suit and sought a TRO to immediately preserve the *status quo ante*, in contemplation of subsequent preliminary injunction and then merits proceedings. The district court held a hearing on Monday, where Defendants requested leave to file a brief opposing the TRO request. The district court granted that request while noting its inclination to enter a temporary administrative order to freeze the *status quo ante* while the parties briefed the issues. On Monday night, the district court

1

entered such an order, providing only that Special Counsel Dellinger would remain in office "from the time of this order through midnight on February 13, 2025."

The district court's order will expire tomorrow. At that point, any appellate request regarding that order will be moot, and the district court either will or will not separately grant Special Counsel Dellinger's application for a TRO. Nevertheless, Defendants filed an "emergency motion" for a stay pending appeal. As explained below, they have failed to establish any basis for appellate jurisdiction, given that orders granting or denying TROs are ordinarily not appealable, and this three-day stay was hardly the equivalent of a durable preliminary injunction. For that reason alone, their motion should be denied. In any event, Defendants do not satisfy any of the standards that govern the extraordinary relief that they seek in this Court.

## STATEMENT

Before turning to the jurisdictional defects in Defendants' position—as well as the traditional stay factors—we first provide context concerning the role of the OSC, the history of its statutory for-cause removal protection (which reflects a considered inter-branch agreement), and the proceedings that led to this point.

## I.    THE UNITED STATES OFFICE OF SPECIAL COUNSEL

### A.    The Founding and Mission of the OSC

The Office of Special Counsel is an independent federal agency, originally established in the Civil Service Reform Act of 1978 (CSRA). *See* 5 U.S.C. § 1211(a). The CSRA began with President Carter, who recommended creating a Special Counsel, "appointed by the President and confirmed by the Senate" to investigate and prosecute abuses of civil service laws, and the Merit Systems Protection Board (MSPB), a nonpartisan board removable only for cause to adjudicate those disputes. *See* Federal Civil Service Reform Message to the Congress (Mar. 2, 1978). This structure, President Carter explained, would "guarantee independent and impartial protection to employees" and thereby "safeguard the rights of Federal employees who 'blow the whistle.'" *Id.*

Congress accepted President Carter's proposal, including the MSPB and the Special Counsel with for-cause removal protections. *See* S. 2640, 95th Cong. (Mar. 3, 1978); H.R. Rep. 95-1403, at 388 (1978) (supp. views of Rep. Solarz). Congress made an express finding that the "authority and power of the Special Counsel" was required to "investigate allegations involving prohibited personnel practices and reprisals against Federal employees." Civil Service Reform Act of 1978, § 3(4), Pub. L. No. 95–454, 92 Stat. 1112. Consistent with that vision, Congress provided that

the Special Counsel could be removed "by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act of 1978, § 1204. This drew an initial objection from the U.S. Department of Justice Office of Legal Counsel (OLC), which President Carter effectively overruled when he subsequently signed the law, declaring it would create "a new system of excellence and accountability." *Compare Memorandum Opinion for the General Counsel, Civil Service Commission*, 2 Op. O.L.C. 120 (1978), *with President Jimmy Carter Remarks on Signing the Civil Service Reform Act of 1978 into Law* (Oct. 13, 1978).

In 1988, Congress again grew concerned that federal whistleblowers were not adequately protected, and crafted the Whistleblower Protection Act to "strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government." § 2(b), Pub. L. No. 101–12, 103 Stat. 16.

President Reagan, however, pocket vetoed this legislation in 1988, objecting to several new authorities that the legislation would vest in the OSC including the authority to seek judicial review of adverse MSPB decisions in federal court, which would "permit[] the Executive branch to litigate against itself." Memorandum of

Disapproval on a Bill Concerning Whistleblower Protection (Oct. 26, 1988).[1] President Reagan also suggested hesitancy about the bill's for-cause removal protections, which were identical to those already in effect. *Id.*

After the pocket veto, Congress worked closely with Presidents Reagan and Bush to address their separation-of-powers concerns. Because of these negotiations, the revised bill—the enacted Whistleblower Protection Act of 1989—no longer authorized the OSC to pursue litigation against other agencies in federal court. *See* 135 Cong. Rec. 5012, 5039 (Mar. 21, 1989) (statement of Rep. Parris).

But those negotiations did not displace the OSC's status as an independent agency or its existing for-cause removal provision. As the Subcommittee on Civil Service emphasized on this very point, federal employees required "assurance that the Office of Special Counsel is a safe haven," because otherwise it "can never be effective in protecting victims of prohibited personnel practices." 135 Cong. Rec. 5012, 5034 (Mar. 21, 1989) (Joint Explanatory Statement); *see also* 135 Cong. Rec. 5012, 5032 (Mar. 21, 1989) (statement of Rep. Sikorski). President Bush's Attorney General endorsed the bill and "pledged" to lobby for the Act. *See* Letter from Attorney General to Sen. Levin dated Mar. 3, 1989, 135 Cong. Rec. 5012, 5033-34.

---

[1] Available at https://www.reaganlibrary.gov/archives/speech/memorandum-disapproval-bill-concerning-whistleblower-protection.

Ultimately, President Bush agreed that the revisions had "addressed" the "constitutional concerns" he and President Reagan had raised about the Act. *See* George H.W. Bush, Remarks on Signing the Whistleblower Protection Act of 1989 (Apr. 10, 1989). In signing the Act, he praised that the Act would "enhance the authority of the Office of Special Counsel to protect whistle-blowers," and that it "retain[ed] current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance." *Id.*

### B. The OSC's Jurisdiction and Functions

As Congress and two President contemplated, the OSC maintains a unique and independent position to protect federal employees from prohibited personnel practices (PPPs), especially reprisal for whistleblowing. The OSC also affords a secure channel for employees to blow the whistle on wrongdoing. It civilly enforces the Hatch Act. And it assists Congress' legislative and oversight agendas.

Significantly, none of the OCS's authorities regulate or penalize private activity. Instead, as an "ombudsman" and "watchdog," *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 162-63 (D.C. Cir. 1982), the OSC has "only limited jurisdiction to enforce certain rules governing Federal Government employers and employees," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 221 (2020). Even as to federal employees, the OSC does not impose any discipline or other adverse action

directly. Instead, the OSC receives allegations of PPPs, assesses and investigates such complaints, and decides on a proper course of action. *See* 5 U.S.C. § 1212(a). Where the OSC finds reasonable grounds of a PPP, it first works with the relevant agency head to ensure corrective action is taken voluntarily and the PPP victim receives relief. Absent voluntary settlement, the OSC may petition MSPB on the injured employee's behalf, *id.* § 1214, which an employee may do in their own right, *id.* § 1221. In addition, the OSC can file a complaint with the MSPB asking that a perpetrator of a PPP be disciplined. *See id.* § 1215. The Special Counsel also has authority to investigate and seek remedies for violations of the Hatch Act, and to issue nonbinding advisory opinions concerning that Act. *See id.* §§ 1212(f), 1216. The OSC exercises no authority over the MSPB, whose decisions are subject to judicial review, *id.* §§ 1214(c)(2), 1215(a)(4), 7703(b). The OSC cannot proceed directly in any Article III court sometimes as an amicus. *See id.* § 1212(h).

Beyond its HR investigative role, the Whistleblower Protection Act authorizes the OSC to receive reports from employee-whistleblowers within agencies. *See* 5 U.S.C. § 1213(a). However, if a report appears credible, the OSC cannot conduct its own investigation—it reviews the investigation conducted by the whistleblower's agency, and then reports the investigation and the OSC's own assessment to

Congress and the President. *See id.* §§ 1212(a)(3), 1213(c)-(e). The Special Counsel must keep the identity of any whistleblower strictly confidential. *Id.* § 1213(h).

Finally, Congress has delegated to the OSC functions that are best described as quasi-legislative in nature. Virtually every action taken by the OSC—from receipt of allegations, to agreed corrective actions, to complaints in the MSPB—must be reported to Congress to inform legislative functions, including oversight and legislation. *See id.* § 1217; *see also id.* § 1218 (reporting to the President).

## II.     PROCEDURAL HISTORY

Plaintiff Hampton Dellinger has served as Special Counsel since March 6, 2024, following his nomination by the President and confirmation by the Senate to a five-year term. On February 7, 2025, Special Counsel Dellinger received an email from Sergio Gor, Assistant to the President and Director of the White House Presidential Personnel Office, that purported to remove him from office. That email stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position as Special Counsel of the US Office of Special Counsel is terminated, effective immediately. Thank you for your service[.]" Ex. A to Compl., ECF 1-1.

On Monday morning, February 10, 2025, Special Counsel Dellinger filed a complaint and simultaneously sought a TRO to preserve the status quo ante pending further proceedings. The case was assigned to the Hon. Amy Berman Jackson. *See*

No. 25-cv-00385 (D.D.C.). That afternoon, Judge Jackson held an in-person hearing, where Defendants had an initial opportunity to present their positions. Judge Jackson asked if Defendants would "extend the effective date of the President's proposed action while [the parties] brief [the motion]," but Defendants refused. Feb. 10, 2025 Tr. ("Tr.") 3:1-18, ECF 9. Defendants instead opposed the TRO, primarily disputing any irreparable harm for the same reasons raised in their motion. *Compare* Tr. 4:14-7:10, 11:4-12:12, *with* Mot. 17. On the merits, Defendants cited little caselaw and misstated the Executive Branch's historical position on the OSC's constitutionality. *Compare* Tr. 8:1-5, *with supra* at 2-4; *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *9 (O.L.C. July 8, 2021).

Ultimately, Defendants requested leave to file an opposition to Special Counsel Dellinger's TRO the next day. Tr. 27:23-24. With that schedule, the Court made clear that it might also issue an "an administrative stay that holds everything in abeyance until I've had an opportunity at least to read that and rule on the motion for temporary restraining order." *Id.* 25:8-11. Counsel for Defendants did not object to that specific form of relief (other than offering general objections to a TRO). Tr. 25:17-20. Nor did counsel indicate that Defendants would appeal, seek mandamus, demand a stay, or otherwise seek emergency relief from the D.C. Circuit.

At 8:20 PM that night, Judge Jackson issued an administrative stay, ordering "that from the time of this order through midnight on February 13, 2025, plaintiff Hampton Dellinger shall continue to serve as the Special Counsel of the Office of Special Counsel, the position he occupied at 7:22 p.m. on Friday, February 7, 2025." Minute Order, 8:20 PM, Feb. 10, 2025. An hour later, Defendants filed a notice of appeal. ECF 7. The next morning, Defendants sought a stay from Judge Jackson, ECF 10, to which Special Counsel Dellinger responded, ECF 11. Meanwhile, the underlying TRO motion has been fully briefed before Judge Jackson. ECF 12.

## ARGUMENT

## I.  THE COURT SHOULD DENY A STAY PENDING APPEAL BECAUSE IT LACKS JURISDICTION OVER THIS APPEAL

Under settled principles of appellate jurisdiction, the Court lacks authority to consider this appeal. For that reason alone, it should deny Defendants' motion.

### A.  The Court Lacks Appellate Jurisdiction

Under 28 U.S.C. § 1292(a)(1), courts of appeals have jurisdiction of appeals from "interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." By virtue of this textual restriction to "injunctions," the "general rule is that orders granting, refusing, modifying, or dissolving temporary restraining orders are not appealable under § 1292(a)(1)." 16 *Fed. Prac. & Proc. Juris.* § 3922.1 (3d ed.). As

Defendants properly concede, temporary restraining orders thus "are ordinarily not appealable." Mot. 20. That core principle directly controls the result here: the district court issued an "administrative stay" that was extremely similar in character to a TRO—except that it was even *more* temporary and limited than a typical TRO, since it sunsets by its own terms after three days and expressly contemplates further briefing on the underlying motion for entry of a TRO. *See, e.g.*, *Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 692 (3d Cir. 1997) ("[T]emporary restraining orders are of short duration and terminate with a ruling on the preliminary injunction, making an immediate appeal unnecessary to protect the rights of the parties.").

Nevertheless, Defendants assert that the temporary "administrative stay" was "more akin to preliminary injunctive relief." Mot. 20 (citation omitted). They base this conclusion on the fact that the order required them to take action they view as significant. *See id.* at 20-21. But Defendants are mistaken: the order simply required the temporary preservation of the *status quo ante* before the unlawful termination of Special Counsel Dellinger. *See Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (explaining that the "status quo" to be preserved by interim relief "is the last actual, peaceable uncontested status which preceded the pending controversy" (quoting *Black's Law Dictionary* 1410 (6th ed. 1990))). And the district court entered this

limited order purely to preserve those equities while it reviewed the issues and gave Defendants an opportunity to submit briefing.

Nothing about this decision—which will expire tomorrow and remains under study by the district court—suggests that it is really a durable preliminary injunction. *See United States v. Dep't of Lab. v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006) ("A preliminary injunction . . . is distinguished from a TRO . . . only by its duration—a preliminary injunction is of indefinite duration extending during the litigation, while a TRO is limited in duration"). To be sure, the district court's administrative stay order requires some action and inaction by Defendants (to restore the *status quo ante*), but that is the very definition of a TRO and does not inherently transform the TRO into a preliminary injunction. *See* Fed. R. Civ. P. 65(d)(1)(C) ("every injunction *and restraining order*" must "describe in reasonable detail . . . the act or acts *restrained or required*" (emphasis added)).

The authorities cited by Defendants are largely irrelevant. *Sampson v. Murray*, 415 U.S. 61 (1974), merely held that a TRO that endures beyond Rule 65's time limits must be treated as a preliminary injunction. In *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008), this Court treated the denial of a TRO as appealable where it was "tantamount to denial of a preliminary injunction" because it barred the plaintiff "from pursuing further interlocutory relief." *Id.* at 455. And in *Garza v. Hargan*, No.

17-5236, 2017 WL 9854552 (D.C. Cir. Oct. 20, 2017), *vacated in part on reh'g en banc*, 874 F.3d 735 (D.C. Cir. 2017), *vacated sub nom. Azar v. Garza*, 584 U.S. 726 (2018), the parties "agree[d]" that the temporary restraining order "was more akin to preliminary injunctive relief." *Id.* at *1 n.1. Here, none of those considerations apply, and the proper view is that the district court issued a *de facto* three-day TRO.

Accordingly, the Court lacks jurisdiction over this appeal and should deny a stay pending appeal. *See Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1306 (1985) (Burger, C.J., in chambers) (articulating that principle).

## B. An Exercise of Mandamus Jurisdiction is Unwarranted

Alternatively, in a throw-away sentence at the end of their brief, Defendants ask the Court to treat their motion as a mandamus petition. *See* Mot. 21. But they never even articulate the mandamus standard, let alone explain why they satisfy it. By failing to provide anything but a conclusory assertion that the order under review warrants mandamus relief, Defendants have forfeited this woefully undeveloped argument. *See, e.g.*, *United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016); *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003).

Regardless, mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004), and this Court regularly rejects such requests, *see In re Garland,* No. 23-

5154, 2023 WL 5662104, at *1 (D.C. Cir. Sept. 1, 2023). It should do so again here. Defendants cite no case in which a court has granted mandamus in remotely comparable circumstances: a district court order preserving the *status quo ante* for a matter of three days to allow the parties to brief the issues in dispute (here, in response to a direct request from Defendants for a chance to submit such briefing, despite notice that the court was contemplating an administrative stay).

## II. DEFENDANTS FAIL TO ESTABLISH THEIR ENTITLEMENT TO EXTRAORDINARY RELIEF

For the reasons given above, the Court should deny Defendants' motion based on lack of jurisdiction. In any event, Defendants' request falls short in every respect.

### A. Defendants Are Not Substantially Likely to Prevail on the Merits

Special Counsel Dellinger is substantially likely to prevail on his claims, all of which rest on the premise that he has been unlawfully removed from office in violation of his statutory for-cause removal protection. *See* 5 U.S.C. § 1211(b). Defendants' sole merits argument is that this statutory protection is unconstitutional. But that is mistaken. Section 1211(b) is fully consistent with the separation of powers and applicable Supreme Court precedents. Indeed, the application of a for-cause removal provision to the OSC advances core statutory purposes, reflects a considered inter-branch agreement, and poses no harm to Article II authorities.

14

The Supreme Court's original pronouncement on this issue is *Humphrey's Executor v. United States*, which upheld the constitutionality of a materially identical restriction on the President's authority to remove members of the Federal Trade Commission (FTC). 295 U.S. 602, 625-26, 629 (1935). There, the Supreme Court explained that Congress had created the FTC as an independent agency—and that the FTC held not only executive authorities, but also "specified duties as a legislative or as a judicial aid" that distinguished it from being "an arm or an eye of the executive." *Id.* at 628. For example, the FTC was required to "mak[e] investigations and reports thereon for the information of Congress . . . in aid of the legislative power," in which function it "acts as a legislative agency." *Id.* Because of the FTC's quasi-legislative and quasi-judicial roles, the Supreme Court concluded that Congress could appropriately impose for-cause limits against presidential removal. More broadly, the Supreme Court recognized in *Humphrey's Executor* that Congress could shield agency heads from removal without cause where Congress deemed such protections necessary to secure a proper measure of impartiality, expertise, and independence. That ruling forms the basis for a substantial part of the modern federal government. *E.g.*, *Wiener v. United States*, 357 U.S. 349, 355-56 (1958).

In recent years, of course, the Supreme Court has weighed in against removal limits for single-headed agencies that wield substantial regulatory and enforcement

authority over private actors. First came *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020). There, the Supreme Court noted that for-cause removal limits for single-person agency leadership structures are a relatively recent phenomenon. *See id.* at 220-22. It then concluded that applying such statutory protections to the Director of the CFPB raised exceptionally grave concerns in light of the Director's broad power to "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Id.* at 225. As the Supreme Court noted, the Director's authority to "dictate and enforce policy for a vital segment of the economy affecting millions of Americans" infringed on Article II. *Id.* Accordingly, the Supreme Court held that the President must be able to remove the CFPB Director at will. *See id.* at 227-238. In reaching this conclusion, though, the Supreme Court expressly distinguished the OSC, which "exercises only limited jurisdiction to enforce certain rules governing Federal Government employers and employees" and "does not bind private parties at all or wield regulatory authority comparable to the CFPB." *Id.* at 221.

Whereas *Seila Law* distinguished removal protections at the OSC, it expressly cast into doubt such protections at the Federal Housing Finance Agency (FHFA)—which were stricken down one year later in *Collins v. Yellen*, 594 U.S. 220 (2021). In reaching this conclusion, *Collins* reasoned that asserted differences between the

CFPB and FHFA regarding the "nature and breadth" of their authority were not dispositive of the constitutional analysis—adding that the FHFA was in some respects *more* powerful than the CFPB and that it had direct "regulatory and enforcement authority over two companies that dominate the secondary mortgage market and have the power to reshape the housing sector." *Id.* at 251, 253.

As explained in more detail below, *see* ECF 2-1, *Humphrey's Executor*, *Seila Law*, and *Collins* all support the constitutionality of the OSC's removal limitation.

*First*, *Seila Law* and *Collins* were animated by a profound concern about the President's inability to remove officials exercising executive power in ways that could "dictate and enforce policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 591 U.S. at 225; *accord Collins*, 594 U.S. at 255. As the Supreme Court recognized when it distinguished the OSC in *Seila Law*, that concern is not present here. The OSC is a primarily investigative agency with limited advisory and reporting functions—all focused on human-resources issues. In performing these functions, the OSC does not regulate or penalize private activity. *See Seila Law*, 591 U.S. at 221 (noting that the OSC "does not bind private parties at all"). The OSC lacks the power to issue final regulations, oversee adjudications, commence prosecutions, determine what penalties to impose, appear in an Article III tribunal (except as an amicus), or control in any way the substantive regulatory

17

framework for any public or private entities. While the OSC's work is essential, it occurs within a "limited jurisdiction" related to federal employers and employees. *Id.* at 221. It poses no "special threat to individual liberty" for the Special Counsel to receive limited independence from direct political control in reviewing and investigating confidential whistleblower reports from federal employees. *See id.* at 223.

*Second*, consistent with the reasoning of *Humphrey's Executor*, the OSC exists to vindicate quasi-legislative functions and interests held in common by Congress, the Executive Branch, and the public. In that respect, the OSC is more than just an aspect of the executive power. *See Humphrey's Executor*, 295 U.S. at 628. Moreover, the OSC's structure—including its for-cause removal provision— reflects a heavily negotiated inter-branch resolution that was embraced by President Bush when he signed the Whistleblower Protection Act (and by his Attorney General in cooperating to pass the bill). *See supra* at 2-4. In fact, not one, but two presidents—Carter and Bush—signed legislation with for-cause removal protections at the OSC, making clear that any interstitial concerns raised by their subordinates at OLC had either been addressed or overruled by the Office of the President.

*Finally*, the need for independence at the OSC is unique in its character and purposes. With respect to the CFPB and FHFA, the case for agency independence

rested heavily on a substantive belief that economic regulation should be free of specific forms of presidential political control. *See Seila Law*, 591 U.S. at 207; *Collins*, 594 U.S. at 229-30. Put differently, agency independence in those settings was specifically designed to restrain the President's ability to direct the agencies' regulatory powers consistent with his agenda. Here, in contrast, the OSC lacks any regulatory powers—and the independence afforded by its statutory for-cause removal provisions serves an entirely different function. Rather than hamper the President's substantive regulatory agenda, the OSC's independence functions to protect and assure whistleblowers. If the official charged with protecting whistleblowers from retaliation was himself utterly vulnerable to retaliation and removal for taking on politically charged or inconvenient cases, then the OSC's whistleblower protection purpose might fail when it is most needed. Simply put, Congress reasonably concluded—and two Presidents agreed—that the Special Counsel cannot serve as an independent watchdog, or properly protect whistleblowers, if he is subject at all times to removal without cause by the President.

Defendants largely ignore all this. Instead, they point to President Biden's decision to remove the Commissioner of Social Security (and a few cases on the same point). Mot. 11, 13. But the very OLC opinion that authorized his decision regarding the Social Security Administration—an OLC opinion issued after Seila

Law and Collins—went out of its way to expressly distinguish the OSC by virtue of its "primarily investigatory function" and "limited jurisdiction." *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *6 n.1 & *9 (O.L.C. July 8, 2021). For good reason: the OSC is indeed quite different.

Given all this, Defendants have failed to show that they are substantially likely to succeed in proving the unconstitutionality of the Special Counsel's for-cause removal protection. Thus, they have failed to prove an entitlement to relief.

## B.    Defendants Fail to Establish Irreparable Harm Absent Relief

Defendants assert in conclusory terms that the decision below granting a three-day administrative stay works an "extraordinary harm" to the Presidency. Mot. at 17. But this confuses the merits with the irreparable harm inquiry. In any event, Defendants do not describe any clear or concrete harm that will result from Special Counsel Dellinger functioning in his Senate-confirmed role while the district court rules on the pending TRO application (which might well occur by tomorrow).

## C.    The Remaining Equitable Factors Cut Against Defendants

Defendants assert that Special Counsel Dellinger experienced no cognizable injury when he was illegally terminated—and that he therefore can assert no equity in the outcome of this proceeding. That counterintuitive position is quite mistaken. And a broader assessment of the public interest cuts sharply against Defendants.

According to Defendants, the President can terminate any agency official with for-cause removal protections, at any time, for any reason—and the fired official cannot seek interim relief or reinstatement. If accepted, that claim would reduce for-cause removal protections to rubble: a President could fire independent officials at will and, months or years later, after final judgment and appeal, those fired officials might (at most) be able to recover some backpay from the Treasury … but nothing more. On that view, a century of ink and energy devoted to agency independence has largely been a misadventure, since Presidents could simply buy their way out and courts would be effectively powerless to remedy those unlawful terminations.

Needless to say, that view is inconsistent with precedent and common sense, and with the structure and purpose of statutory for-cause removal protections. As Special Counsel Dellinger thus explained in detail below, ECF 12, at 6, he has experienced substantial, cognizable irreparable harm by virtue of Defendants' conduct—and he is also a proper party to assert the institutional equities of the OSC itself, which are substantial given the Office's need for a measure of political independence in light of its core confidential whistleblower protection function.

Indeed, the irreparable harm to Special Counsel Dellinger in both his personal and official capacity is even more apparent than when he filed his complaint. The President has already developed a track record of removing independent agency

heads (whether lawfully or unlawfully) and then appointing an acting head in their place, only for the acting head to bring the agency's work to an immediate (and possibly indefinite) halt. *See, e.g.*, Stacy Cowley, *Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau*, N.Y. Times (Feb. 10, 2025). Earlier this week, the President purported to appoint a new Acting Special Counsel to lead the Office of Special Counsel. *See* Chris Cameron, *A judge blocked Trump's firing of a government watchdog*, N.Y. Times (Feb. 10, 2025). That decision directly contradicts Defendants' claim below that the OSC will continue to function as it had in the past because the Special Counsel would be replaced in the interim by the Acting Special Counsel, a career Principal Deputy Special Counsel. *See* Feb. 10 Tr. at 4:2-4, 26:10-14. Now, instead, the President has purportedly named as Acting Special Counsel Doug Collins—a political appointee also expected to serve as the Senate-confirmed Secretary of the Department of Veterans Affairs and as the new Acting Director of the Office of Government Ethics. These actions threaten to upset the OSC's functioning at a time that its statutory role in protecting whistleblowers is most needed. The public interest plainly favors preserving the *status quo ante*.

*  *  *  *  *

Accordingly, Defendants' emergency motion for a stay should be denied for two independent reasons. *First*, the Court lacks jurisdiction over this appeal because

the administrative stay functions like a non-appealable TRO and Defendants do not come close to establishing a right to mandamus relief. And *second*, Defendants are not entitled to a stay because they cannot satisfy any of the relevant standards (let alone all of them). For these reasons, and to avoid undue confusion and disruption at the OSC, this Court should allow the district court an opportunity to rule on the Special Counsel's pending TRO motion, as is likely to occur within the next day.

## CONCLUSION

Special Counsel Dellinger respectfully requests that the Court deny Defendants' emergency stay motion.

Respectfully submitted,

Kate L. Doniger\*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
kdoniger@heckerfink.com

*/s/ Joshua A. Matz*
Joshua A. Matz, Bar No. 1045064
Jackson Erpenbach, Bar No. 1735493\*
Benjamin Stern, Bar No. 90027569\*
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@heckerfink.com
jerpenbach@heckerfink.com
bstern@heckerfink.com

*Attorneys for Plaintiff-Appellee Hampton Dellinger*

*\*D.C. Circuit application forthcoming*

DATED: February 12, 2025

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,022 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)96) because this document has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

Dated: February 12, 2025

/s/ Joshua A. Matz

Joshua A. Matz
*Counsel for Plaintiff-Appellee*
*Hampton Dellinger*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2025, I electronically filed the foregoing

response brief with the Clerk for the United States Court of Appeals for the D.C.

Circuit by using the CM/ECF system. A true and correct copy of this brief has been

served via the Court's CM/ECF system on all counsel of record.

Dated: February 12, 2025

/s/ Joshua A. Matz
Joshua A. Matz
*Counsel for Plaintiff-Appellee*
*Hampton Dellinger*